Filed 11/25/14  P. v. Winston CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B253557 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA129252) |
| v. | |
| DARRYL TRACY WINSTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sean D. Coen, Judge.  Affirmed.

Daniel R. McCarthy, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

Defendant and appellant, Darryl Tracy Winston, appeals from the judgment entered following a jury trial which resulted in his conviction of possession for sale of cocaine base (Health & Saf. Code, § 11351.5) and the trial court's findings he previously had been convicted of possession for sale of cocaine base pursuant to Health and Safety Code section 11370.2, subdivision (a) and had served a term in prison pursuant to Penal Code section 667.5, subdivision (b) following his conviction of several other felonies. The trial court sentenced Winston to nine years in state prison. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

On July 23, 2013, Los Angeles Police Department Detective John Armando was working in the Southeast Narcotics Unit. At approximately 4:50 p.m., the detective, an experienced narcotics officer, was at the Nickerson Gardens Housing Project, a "location [which] has been the subject of a number of narcotic complaints and . . . an area that [the narcotics team] routinely work[s]." At the time, both Armando and his partner, Officer Nicholas Gallego, who also had extensive training and experience in the area of narcotics, were dressed in plain clothes (jeans and T-shirts) and were in a "plain minivan." Armando had parked the van just south of Nickerson Gardens, facing west on Imperial Highway. He explained he had parked at that particular location because, although "in Nickerson Gardens there is a network of cameras . . . monitored by the police department at [the] Southeast Station[,] [and] [t]hose cameras provide really good coverage of the projects, . . . there are a number of blind spots." Armando had parked at the location on Imperial Highway next to a parking area just south of 115th Street because it afforded the officers a good view of a problem spot which was not covered by the cameras, but where Armando and Gallego knew narcotics were being sold. Armando was sitting in the driver's seat and Gallego was in the seat just behind the front passenger seat. Armando and Gallego, who were approximately 100 feet from Winston, used binoculars and were able to see him "seated against a ledge with a couple of other individuals." In addition, three or four other people were walking among the cars parked in the parking lot.

2

While Armando and Gallego watched, Winston was approached by a Black woman wearing shorts and a black top. The two "seemed to engage in [a] short conversation at which time she handed [Winston] some money." Winston accepted the money, stood up and walked to a blue storage container sitting on the lawn approximately 10 feet behind him. He opened the blue container, removed a small red container, then motioned the woman to come to him. Winston opened the red container and removed a small plastic bindle from inside. As he handed the object to the woman, Armando could see that it contained an "off-white solid resembling cocaine base." The woman took the object, closed her hand and walked away in an "eastward" direction. According to Armando, it was "sunny, daylight," and he had an "unobstructed view of [Winston]." Gallego, too, indicated the light was "bright" and, although there were trees and a trash container in the area, nothing was obstructing his view.

After the woman walked away, Armando and Gallego "formed the opinion . . . a narcotic[s] transaction had occurred and [they] attempted to make contact with [the] female." Armando made a U-turn on Imperial Highway and proceeded North on Success Street. The officers did not, however, see either the Black woman or Winston. They parked the van in a lot of off 115th Street, got out and began to walk through the apartment complex. There, they saw Winston, "ma[d]e contact with him" and Armando placed him under arrest. In the meantime, Gallego searched Winston's blue container. Along with some clothing and trash, Gallego found a "small red object about the size of a softball," removed it from the blue container, opened it and found inside two plastic baggies containing "off-white solid[s] resembling cocaine base." One of the baggies contained "eight individual off-white rock solids resembling cocaine base" and the other contained "13 off-white rock solid[s] resembling cocaine base."

Once the evidence had been recovered from the red container, Armando searched Winston and found four $5 bills in his right front pocket. Winston and the plastic baggies found in his container were transported to the station. There, the plastic baggies were booked into evidence. They were placed in a manila envelope and "labeled with the case number, [Armando's] name, [and Winston's] name." The envelope was then sealed and

3

placed in a secured locker. From the locker it was later taken to the laboratory for analysis.

Based on his "background, training, and experience," Armando was of the opinion Winston possessed rock cocaine for sale. He based his opinion on the fact he had seen what he believed had been the sale of cocaine, the 21 rocks of cocaine found in Winston's possession which had been cut and packaged in doses which generally sold for $5, and that Winston, himself, was neither smoking cocaine nor carrying with him smoking paraphernalia.

Jane Villegas is a criminalist for the Los Angeles Police Department assigned to the "scientific investigation division narcotics analysis unit." Villegas, a trained forensic scientist, has been analyzing controlled substances since 1991. On July 24, 2013, Villegas examined the contents of an evidence envelope with Winston's name on it. She had obtained the sealed envelope from the "narcotics storage locker." Inside the envelope were two "knotted plastic sandwich bag[s] containing off-white solid[s]." The first baggie weighed 1.92 grams. Using the off-white solids from inside that baggie, Villegas "identified the kind of narcotic by using a microcrystal test and an instrumental analysis." She concluded the baggie contained "cocaine in the form of cocaine base." Villegas did not test the off-white solids in the second baggie. Since the solids in the second baggie looked "very similar" to those in the first baggie, she did not believe she needed to perform any tests on them. Villegas had no doubt the solids in the first baggie contained cocaine base.

2. *Procedural history*

Following a preliminary hearing, on August 22, 2013 Winston was charged by information with one count of possession for sale of cocaine base (Health & Saf. Code, § 11351.5), a felony. It was further alleged he previously had been convicted of possession for sale of cocaine base within the meaning of Health and Safety Code section 11370.2, subdivision (a) and had served a prison term within the meaning of Penal Code section 667.5 for convictions of assault with a deadly weapon other than a firearm (Pen.

4

Code, § 245, subd. (c)), battery against a police officer (Pen. Code, § 243, subd. (c)(2)) and the federal offense of being a felon in possession of a firearm.

Prior to trial, the prosecutor indicated Armando, the arresting officer, intended to exercise his privilege pursuant to Evidence Code section 1040 to withhold information regarding his whereabouts when he observed Winston sell the cocaine base. At an in-camera hearing held in chambers, Armando testified he believed if the "observation post [were to be] revealed, it would surrender a significant tactical advantage" and "endanger a particular resident [of Nickerson Gardens] who [knew of law enforcement's] actions at that location." In addition, the detective indicated the location was "the only spot where [officers could] be undetected without going into the projects [and] that [they were] able to see this one [particular] spot [from] where" they knew drugs were being sold. The trial court determined, although Evidence Code section 1040 might otherwise apply, the evidence was material to the defense and "defense [counsel] would have to have an opportunity to cross-examine regarding the location of the narcotics post."

The prosecutor then argued he should be allowed to present evidence pursuant to Evidence Code section 1101, subdivision (b) that, 13 years earlier, Winston had been convicted of possession for sale of cocaine base. In the 13-year-old case, Winston had been in his residence when he was "found to be in possession of a loaded firearm and . . . was near a cutting board that had rock cocaine on it[.]" The prosecutor argued the evidence would be relevant to show a "common plan." The trial court, however, determined an incident which had occurred 13 years earlier was too far removed from the present action and it was "not going to allow the admission of [the] prior conduct" or conviction.

After the prosecution presented its case, defense counsel made a motion to dismiss the matter pursuant to Penal Code section 1118.1. The trial court denied the motion, indicating "the evidence [was] quite sufficient to show the defendant [was] guilty of the charged count . . . ."

While the jury was deliberating on the substantive count, Winston decided, if the jury found him guilty of the offense, he would waive his right to have it determine

5

whether he had been convicted of the alleged prior convictions and served the alleged prior prison term. Winston indicated the court, alone, could make those determinations.

During their deliberations, the jury sent the following inquiry to the trial court: " 'We would like to hear [D]etective Armando's testimony.' " In response, the trial court sent a note to the jury stating, " 'Is there a particular portion of that testimony you would like to hear or would you like to hear all of that testimony?' " The jury informed the trial court it wished to "hear [the] entire testimony of Officer Armando."

At approximately 10:50 a.m. on November 18, 2013, the jury indicated it had reached a verdict. The court clerk read the verdict as follows: "We the jury in the above-entitled action find the defendant, Darryl Tracy Winston, guilty of the crime of possession for sale of cocaine base, in violation of Health and Safety Code section 11351.1, a felony, as charged in count 1 of the information . . . ." When the jury was polled, each individual juror indicated he or she had reached this conclusion.

At proceedings held on December 2, 2013, the trial court was to determine the truth of the allegations of Winston's prior convictions and prison term and to impose sentence. However, before the court could address those issues, Winston indicated he wished to have a *Marsden*[1] hearing.

After everyone except the court, its staff, Winston and his counsel had left the courtroom, Winston indicated that during trial his counsel had failed to present evidence of his alibi: that although the police officers had testified he had been sitting on a ledge with several other individuals, he had actually been at his home talking on the telephone with his girlfriend. Winston indicated he had a "phone record" which showed this and that there existed a video tape which showed him coming out of his house. Winston added that he had been coming from his front door, had been walking around to the parking lot and had been nowhere near "the ledge" when he was "grabbed" by the officers and taken into custody. Winston believed the officers had been "going for" him and had arrested him although he was innocent of the charge.

---

[1]     *People v. Marsden* (1970) 2 Cal.3d 118.

In response, defense counsel indicated, although she had in her possession a video tape which "show[ed] Mr. Winston coming from the area of 115th where he" resides, it also showed him being detained by Armando in essentially the manner testified to by the detective. According to counsel, the video also "show[ed] the area of the blind spot which is the area in between the two buildings." With regard to Winston's girlfriend, counsel had an investigator take her statement and she had indicated she was available to testify. However counsel chose not to call her as a witness because "the statement that was made by her was essentially that there was another individual in the area who looks like Mr. Winston who is involved in the same type of activity . . . ." At the preliminary hearing, the detective had been questioned about this other individual and his responses had apparently not been favorable to Winston.

The trial court concluded it "appear[ed] quite obvious to [the] court all decisions . . . [by defense counsel had been made] for tactical reasons." The court determined "there [had] not been a breakdown in [the] relationship between [counsel] and the defendant" of such a kind that it would be "impossible for [counsel] to properly represent [Winston]" and, accordingly, the court denied Winston's *Marsden* motion.

After the prosecutor returned to the courtroom, Lynda Johnson testified she is a paralegal for the Los Angeles County District Attorney's Office who reviews records regarding the criminal histories of defendants. As to Winston, Johnson determined from a packet prepared by the Department of Corrections that, on July 20, 2010, he had been convicted of assault with a deadly weapon other than a firearm upon a peace officer (Pen. Code, § 245, subd. (c)), resisting an executive officer in the performance of his or her duties (Pen. Code, § 69) and battery against a peace officer (Pen. Code, § 243, subd. (c)(2)). For his convictions of those offenses, Winston had been sentenced to four years in prison. The trial court took judicial notice of the packet as well as a file indicating that, in another matter, Winston had been convicted of possession of cocaine base for sale in violation of Health and Safety Code section 11351.5.

Fingerprint identification expert, Natasha Lerner, had obtained latent prints from Winston earlier that day while he was in the "lockup room." Winston's counsel had been

7

present while she had obtained the prints.  Lerner had then compared the prints she had taken to a set of prints on another document.  Using the "A.C.E.V."[2] method, Lerner concluded the two sets of prints had been "made by one and the same person."  Although her comparison would later be verified by another examiner, Lerner had no doubt both sets of prints had been made by Winston.

After evaluating the evidence presented by Johnson and Lerner, the trial court found the alleged prior convictions and prison term "true beyond a reasonable doubt and that Mr. Winston [was] the individual who [had] been convicted of [the] charges [and served the term.]"

After reviewing the probation report, reading  the People's sentencing memorandum, hearing argument by the parties and noting Winston had been on parole at the time of the offense, the trial court sentenced him to the upper term of five years in prison for his conviction of count 1, possession for sale of cocaine base (Health & Saf. Code, § 11351.5).  The court imposed an additional consecutive term of three years in prison for the finding Winston previously had been convicted of possession for sale of cocaine base pursuant to Health and Safety Code section 11370.2, subdivision (a).  With regard to the finding Winston had previously served a term in prison or county jail pursuant to Penal Code section 667.5, subdivision (b), the trial court imposed a term of one year in prison, the term to run consecutive to the other terms imposed.  In total, the trial court sentenced Winston to nine years.  Relying on the court's decision in *People v. Griffis* (2013) 212 Cal.App.4th 956, the court determined the sentence was to be served in state prison.

With regard to fines and fees, the trial court ordered Winston to pay a $280 restitution fine (Pen. Code, § 1202.4, subd. (b)), a stayed $280 parole revocation restitution fine (Pen. Code, § 1202.45), a $40 court operations assessment (Pen. Code, § 1465.8, subd. (a)(1)), a $30 criminal conviction assessment (Gov. Code, § 70373), and

---

[2]     In the abbreviation "A.C.E.V.," the "A" stands for "analysis," the "C" stands for "comparison," the "E" stands for "evaluation" and the "V" stands for "verification."

a $50 laboratory analysis fee (Health & Saf. Code, § 11372.5). Winston was then awarded presentence custody credit for 133 days actually served and 132 days of good time/work time, for a total of 265 days.

On December 25, 2013, Winston filed a timely notice of appeal. He requested that the record on appeal include "the entire transcript[] including the pre-trial motions [and] the voir dire."

## CONTENTIONS

After examination of the record, counsel filed an opening brief which raised no issues and requested this court to conduct an independent review of the record. By notice filed August 13, 2014, the clerk of this court advised Winston to submit within 30 days any contentions, grounds of appeal or arguments he wished this court to consider. No response has been received to date.

## REVIEW ON APPEAL

We have examined the entire record and are satisfied counsel has complied fully with counsel's responsibilities. (*Smith v. Robbins* (2000) 528 U.S. 259, 278-284; *People v. Wende* (1979) 25 Cal.3d 436, 443.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.                    ALDRICH, J.

9